[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION STATEMENT OF THE CASE
This is an appeal from the assessment of damages levied by the plaintiff for the taking of the defendant's property at 475 Forbes Avenue in New Haven. The property contains a gas station, donut shop, and used car lot and was in full operation on the date of the taking, January 4, 2002. The taking is part of the mammoth project undertaken by the State to create a ten lane bridge over the Quinnipiac River, necessitating large scale land acquisitions for bridge approaches and ramps.
The plaintiff commissioner assessed damages for this total taking at $317,120.00. At trial, the plaintiff's appraiser, John LoMonte, gave his opinion that the market value at taking was $380,600, reduced by $62,880 for environmental remediation costs.
The defendant-appellant presented two appraisals and the two appraisers who prepared them. Patrick Wellspeak set the market value at $630,000 without consideration of any remediation expense. Peter Kilbride's opinion was that the market value was $557,120, including the remediation estimate.
The issue of the environmental remediation cost, its use by the appraisers and its consideration by the court will be addressed below.
 DISCUSSION
With a gap of almost 100 percent between the plaintiff's and the defendant's proposals, a detailed review of the appraisals and court testimony is dictated. Fortunately, the court is familiar with the subject property and several of the comparable sales properties utilized by the experts. A viewing of the subject was conducted after the hearing.
The sale comparables and the subjective "adjustments" applied by the users present concerns for the court. CT Page 15555
Mr. Kilbride utilized two sets of comparables, three to illustrate the prices of land and three to portray comparable gas station sales.
Of the land sales, the first is of a parcel purchased by the adjoining property owner to enhance the operation of his long established successful business. The second sale, about a mile from the first, had housed a failed donut shop, was purchased for a fast food operation and occupies a very desirable corner, across the street from the first gas station comparable used by Mr. Kilbride. The third "land sale comparable" is of a parcel used for retail stores a stone's throw from the subject property.
The adjustments and comparisons in the "lands sales grid" of Exhibits 1 2 invite questions. Under "location," the appraiser describes the first and third parcels as "equivalent" to the subject. He makes only a 10% adjustment in favor of one of the busiest intersections in the area.
The subject property is not inviting to westbound traffic on Forbes Avenue, coming off of Frontage Road. At this point, Forbes Avenue is four lanes wide, two in each direction, causing users to take an awkward route across two lines of through traffic. Similarly, only northbound traffic on Townsend Avenue can comfortably reach the subject site during normal business hours.
Both of the plaintiffs and the defendant's appellant's appraisals include a site sketch of the subject property. These sketches are inaccurate and reflect the condition of Forbes Avenue in front of the subject property when it was a divided highway with a long traffic divider and a single traffic cut opposite the area of the pump island. This made access even more difficult for westbound traffic and has not existed for a substantial period of time.
The gas station site across from the subject property has been inoperative for years and is an eye sore. The adjoining used car operation is just that — an ugly used car lot. It is not a parcel with pleasing aesthetics and inferior in general location to all three comparable land sales, yet only modest adjustments are made by the appraiser to reflect its weaknesses.
When the three gas station comparables are examined we see what appear to be substantial adjustments in toto, but which are puzzling when broke down. Comparable #1 is again the Route 80 — Quinnipiac Avenue corner. It earns only a 10% adjustment for location! Similarly, a 10% adjustment for the structure sums ludicrous when one views the two sites. The same must be said for the two Whalley Avenue comparables. The court cannot accept the CT Page 15556 appraiser's final premise: That with adjusted sale prices ranging from $530,000 to $705,500, "the subject value is more reflective of the upper end of the range at $620,000." In brief, the adjustments in favor of the comparables do not square with reality. They may also be revealing fallacies to this method of appraising.
Mr. Kilbride also offered the opinion that the subject's market value was $665,000.00, using the income capitalization approach. The court had difficulty with his computation, in that he relied too heavily on "estimates" and the unsupported or unexplained data cannot be accepted at face value.
For example, many of the expense items are estimates. Looking at this operation, one seriously doubts the owner devotes almost $6,000 to "management." The gallonage figures would have to be supported for the court to accept them, particularly when compared to some of the comparables — 125 Foxon Boulevard is a good starting point.
Recognizing the impact on the result of the capitalization rate when this method of appraisal is used, the court is not prepared to accept the end result which would place this site in the galaxy of super stations.
The manner in which sales comparables are used by Mr. Wellspeak in his appraisal (Exhibit 3) also creates concerns for the court.
In two of five comparables used, he does not adhere to the usual practice of working from the reported sales price before applying adjustments. Instead, he adds to the actual price an amount to create an inflated sales price. In one case, he adds the amount a station owner told him he spent to improve his property. In the other, he adds the amount the owner told him he would spend to improve his property.
While the court expects any appraisals to contain material one could classify as hearsay, the use of these amounts in this fashion raises questions well beyond hearsay concerns.
In the first instance, his sale #3 (page 34), the addition is $400,000. The end result is a "garage — snack shop — gas" (station). We have no idea whether the work performed replaced an existing feature or amounts to an addition to what existed. We don't know how much of this could be described as an "over improvement" — an expenditure over and above the actual need but catering to the owner's particular likes or dislikes. And, of course, we don't know if it was actually spent. In his sale #1, 863 North High Street, East Haven, the appraiser raises the "sale price" by $200,000 to reflect the owner's announced intentions. CT Page 15557 Apparently, an even larger figure for the planned improvements was reported to Mr. LoMonte.
When this property was bought, it was a garage building containing two repair bays and lifts and an office area. It was solely a garage and gas station when it closed. It is now being converted to a convenience store which will pump gas as well. However, we have nothing, save for the owner's reported statements, to support the claim that the sums will be spent. We do not know what it will be spent on, or even if it will be spent.
In applying adjustments to these comparables, Mr. Wellspeak makes some questionable computations. His sale #5, 125 Foxon Boulevard, receives only a 10% plus adjustment over the subject property for location, for example. It should be noted that the "location" adjustment chart in the appraisal states it is not a corner location. It is on the corner of Route 80 and Quinnipiac Avenue. Then, sales #1 and #3, having had their "sale price" increased as noted above are further adjusted so that #1 is downgraded a net 30%, 35% for location, in favor of the subject. Then, #3 is upgraded over the subject a net 45%.
Were these adjustments applied to the actual purchase prices of #1 and #3, we would be looking at comparables in the area of $200,00 to $300,000. The appraiser, however, only uses sale prices to arrive at "sale price/unit," i.e., per square foot. Thus, with sales #1 and #3 inflated by two thirds and almost 100% respectively, these elevated "per unit" prices are utilized to justify the conclusion that the subject property has a market value of $630,000.00, based on a per square foot value of $360. As set out in the chart facing page 34, the five comparable sales reflect "final adjusted sale price/unit (square foot) of $396.00, 343.00, 404.00 ($412.00 is stated in the "conclusion" on page 38), $373.00 and $361.00. These average out to $375.00.
But the appraiser then makes some further adjustments without outlining their extent and comes up with the $360 per square foot figure he applies to reach $630,000. This "conclusion" (page 38) is seriously flawed in the court's view as it again treats with adjustments already laid out in the page 34 chart — location and overall physical characteristics (including building age and condition, size, quality/appeal, and functional utility).
Having already adjusted for up to 50% in these two areas, the "conclusion" again addresses them, makes comparisons and arrives at the $360 figure.
The court does not find the process employed here to be credible or reasonable and must reject the conclusion with its accompanying value. CT Page 15558
 II
The plaintiff's appraiser was questioned extensively about his use of comparable sales in Cromwell and Southington. The court too had some doubts about their relevance. However, after hearing Mr. LoMonte's explanations and examining his appraisal, the court concludes that his evaluation is reasonable. His market value of this property is $380,000.00, subject to the court's treatment of the environmental problem.
Ignoring that item and examining all the evidence before it, one is struck by the fact that the subject facility is old, ugly, backs up against 1-95, and has an eyesore facing it. When it is compared to the properties used by the appraisers, its purchase at the suggested price could only be justified by its generating a lot of money, and that has not been demonstrated to be a factor in its evaluation.
One of the defendant's appraisers (Kilbride) described its acquisition in 1997 for $598,500 as an "arm's length transaction." Mr. Wellspeak indicted "this was a related party transaction. The fact that it was conveyed by Quit Claim deed supports the latter view. Thus, the court is not impressed by this purchase price, especially after the assessment by the City of New Haven is examined, that figure was $370,000.00.
 III
The treatment of the environmental cleanup cost is the final item the court must consider. As noted above, appraisals are typically pregnant with hearsay implications. The information in dispute is detailed and bears the indicia of reliability. Such a condition as is described is one that is properly a charge against property which reduces is fair market value.
The only point of departure on this item is the added 20% over cost without explanation. Consequently, the court rejects the $62,880 claimed but feels the $52,400 is a proper item in diminution of market value.
 CONCLUSION I
The court finds the market value of the subject property to be $380,000 and that the sum of $52,400 is a proper reduction of that value. Damages are therefore assessed at $327,600.00.
 II CT Page 15559
Since the damages assessed above reflect an increment over the Commissioner's assessment, the defendant — owner is entitled to "such appraisal fees as such trial referee determines to be reasonable." (Sec.13a-76). The court heard no evidence on this subject except for the amounts requested. One of the appraisers testified under a subpoena. It would appear that a hearing must be scheduled unless the parties agree to a submission via affidavit. CT Page 15560